**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRANDY WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-241 |
| | ) | |
| v. | ) | Judge Donetta W. Ambrose |
| | ) | Magistrate Judge Susan Baxter |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.   RECOMMENDATION

It is respectfully recommended that the court grant, in part, Plaintiff's Motion for Summary Judgment, and deny Plaintiff's Motion, in part, deny Defendant's Motion for Summary Judgment, and vacate the decision of the administrative law judge ("ALJ").

### II.   REPORT

**A.    BACKGROUND**

1. Procedural History

Brandy White ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her applications for Child's Insurance Benefits ("CIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act").  Plaintiff filed for benefits, claiming a complete inability to work as of February 15, 2002, due to seizure disorder, mental limitations, and

depression. (R. at 173 – 81, 258 – 59, 263).[1] Despite her claims, Plaintiff was denied benefits under the Act. (R. at 1 – 7, 26 – 45, 86 – 108). Having exhausted all administrative remedies, this matter now comes before the Court on cross motions for summary judgment. (ECF Nos. 9, 11).

## 2. Records Accorded Consideration

The facts relevant to the present case are limited to those records that were available to the ALJ when rendering his decision. All other records newly submitted[2] to the Appeals Council or this Court will not be considered, here, and will not inform the decision of this Court. *See Matthews v. Apfel*, 239 F. 3d 589, 592, 594 – 95 (3d Cir. 2001).[3] Additionally, in her Motion for Summary Judgment, Plaintiff raises no objections to the ALJ's conclusions regarding the impact of her physical impairments on her ability to work. (ECF No. 10 at 10 – 14). As a result, discussion will be limited to the facts on record which pertain to Plaintiff's mental impairments.

## 3. General Background

Plaintiff was born on March 31, 1990, and was nineteen years of age at the time of her application for benefits. (R. at 258). Plaintiff completed high school, but with the help of special educational resources due to cognitive deficits. (R. at 270 – 93, 336 – 48). Plaintiff twice attended Hiram G. Andrews Center for vocational training in 2010, but did not complete

---

[1]    Citations to ECF Nos. 6 – 6-11, the Record, *hereinafter*, "R. at __."
[2]    Exhibits 8E, 9E, 24F, 25F, 26F; R. at 4 – 5, 326 – 31, 498 – 533.
[3]    The Appeals Council may decline review of a claimant's case when the ALJ's decision is not at odds with the weight of the evidence on record. *Matthews*, 239 F. 3d at 592. In such a case, a district court can only review that evidence upon which the ALJ based his or her decision. *Id.* at 594 – 95. As a result, new evidence presented by a claimant to the Appeals Council, but not reviewed, is not within the purview of a district court when judging whether substantial evidence supported an ALJ's determination. *Id.* Furthermore, a district court lacks the authority to review the Appeals Council's decision to deny review of the ALJ's decision. *Id.* at 594. Such is the case at present. Additionally, Plaintiff failed to make the required showing under *Szubak v. Sec'y of Health and Human Serv.*, 745 F. 2d 831 (3d Cir. 1984), for remand to reconsider the case in light of newly submitted evidence not considered by the ALJ when making his decision. Therefore, the case will not be remanded for this purpose, and Exhibits 8E, 9E, 24F, 25F, and 26F (R. at 326 – 31, 498 – 553) will not be discussed.

the program because she was discovered to be cutting herself. (R. at 68 – 69, 425, 475 – 77, 481 – 82, 491 – 95). Plaintiff has never worked. (R. at 263). She lives independently in an apartment with her boyfriend. (R. at 367). Plaintiff's boyfriend receives disability benefits for psychological issues. (R. at 368). Plaintiff subsists on public assistance and additional financial support from her family, and she also receives medical benefits through the state. (R. at 262, 368, 455).

    4. <u>Treatment History</u>

Plaintiff was seen at Family Health Care of Edinboro, in Edinboro, Pennsylvania on December 22, 2008 for a routine physical examination. (R. at 359 – 60). Plaintiff complained of increasing depression over the last few months. (R. at 359). She described experiencing suicidal thoughts, sadness, crying spells, poor sleep, low energy, and low ambition. (R. at 359). She was noted to have engaged in psychological treatment in the past, and that prior medication management had effectively treated her symptoms with no adverse effects. (R. at 359). She was advised to re-start treatment with her former mental health provider. (R. at 359). Plaintiff was prescribed Prozac. (R. at 359). Her mental status was unremarkable, otherwise. (R. at 360).

Plaintiff was seen again at Family Health Care of Edinboro on April 20, 2009 for routine health maintenance. (R. at 355 – 58). At that time, Plaintiff was still in school. (R. at 355). She was noted to be at risk of failing two classes, but was otherwise "doing well." (R. at 355). Plaintiff did not use drugs or alcohol, and regularly engaged in yoga and running for exercise. (R. at 355). It was indicated that Plaintiff had a "mental disability," and was pursuing a career through a vocational rehabilitation program. (R. at 355). Upon examination, Plaintiff was alert and had a normal mental status. (R. at 357). Plaintiff was taking Prozac at the time. (R. at 356).

A vocational evaluation of Plaintiff's work potential was conducted between September 7 and 11, 2009, by the Pennsylvania Department of Labor & Industry at the Hiram G. Andrews Center. (R. at 307 – 15, 363 – 65). Plaintiff was nineteen years of age at the time, and was residing with her boyfriend and his parents. (R. at 307). She was not employed, and her functional impairments included learning disability, cognitive disability, mild mood disorder, borderline intelligence, and seizure disorder. (R. at 307).

Throughout the evaluation, Plaintiff was observed to dress in a neat and clean fashion, and she exhibited no deficits in hygiene or grooming. (R. at 311). No behavioral or physical problems were noted, she had a "very good" relationship with her evaluator, and she was friendly and sociable with peers. (R. at 311). Plaintiff was "always pleasant and amicable." (R. at 311). She demonstrated "intact cognitive status." (R. at 365). In terms of her work behavior, she demonstrated a fair understanding of instructions and was able to communicate when she required assistance. (R. at 311). She appeared focused, attentive, and motivated, and was efficient and on-time. (R. at 311). Plaintiff demonstrated a "fair potential" to complete a vocational rehabilitation program. (R. at 311). She had no difficulty with following written and oral instructions. (R. at 311). She had a "satisfactory" ability to relate well with superiors and co-workers. (R. at 311). An IQ test was administered, and resulted in a verbal score of 74, a performance score of 81, and a full scale score of 76. (R. at 308).

Plaintiff was noted to have a history of issues with slow information processing, depression, and mood problems. (R. at 313). Her mathematics and reading capabilities were limited, she did not have a driver's license, she had difficulty with time computation and measurement, and she exhibited some degree of short-term memory impairment. (R. at 313, 365). However, the results of her evaluation suggested that she was capable of unskilled or

semi-skilled work. (R. at 313). Further counseling was recommended for Plaintiff to determine her vocational goals, and she had a "good prognosis" with appropriate vocational and remedial training. (R. at 314).

Beginning on October 13, 2009, and ending on November 30, 2010, Plaintiff engaged in psychiatric treatment at Stairways Behavioral Health ("Stairways") in Meadville, Pennsylvania. (R. at 422 – 25, 432 – 35). Plaintiff reported a history of depression accompanied by dysphoric mood, appetite and sleep disturbance, difficulty concentrating, increased anxiety, increased irritability, anhedonia, poor energy, and feelings of helplessness, hopelessness, and worthlessness. (R. at 422). She reported taking Prozac on-and-off since she was twelve years of age. (R. at 422). She reported a history of physical altercations, and suicide attempts via cutting and choking. (R. at 422).

Plaintiff was observed to be alert and oriented. (R. at 423). Her speech was coherent and goal-oriented, she was an inconsistent historian, her mood was depressed, her affect was guarded, she reported hallucinations, she appeared paranoid at times, she appeared to have intact memory, she had very limited insight and judgment, and she had significantly below average intelligence. (R. at 423). Plaintiff was diagnosed with severe, recurrent major depressive disorder with psychotic features, and mild mental retardation. (R. at 423). She was assigned a global assessment of functioning ("GAF") score of 50[4]. (R. at 423). Prozac and Abilify were prescribed. (R. at 423).

---

[4]     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

Plaintiff returned to Stairways on February 22, 2010. (R. at 424). She had a soiled appearance, and noticeable body odor. (R. at 424). She had stopped taking her prescribed medications as part of an effort to become pregnant. (R. at 424). Her motor activity, speech, sensorium, thought content, and thought flow were within normal limits. (R. at 424). Her behavior was withdrawn and negative, she was depressed and moderately anxious, her affect was flat, her judgment was fair, her insight was poor, and she had suicidal thoughts. (R. at 424). Plaintiff informed her therapist that she had being doing well before stopping her medications. (R. at 424). She was advised to re-start her medications. (R. at 424).

On March 16, 2010, Plaintiff presented at Family Health Care of Edinboro for complaints of abdominal pain and reflux. (R. at 410 – 11). A mental status examination was normal, and Plaintiff was alert. (R. at 410 – 11). She was noted to be taking prescription Prozac and Abilify for psychological treatment. (R. at 410 – 11).

On April 26, 2010, Plaintiff appeared at Stairways. (R. at 425). Her motor activity, speech, sensorium, behavior, thought content, thought flow, and affect were within normal limits. (R. at 425). Her mood was depressed and moderately anxious, her judgment and insight were fair, and she was without suicidal ideation. (R. at 425). Plaintiff had stopped taking her prescription Abilify, despite having felt better while on it. (R. at 425). Plaintiff reported that she was to start a vocational education program at Hiram G. Andrews Center in Johnstown, Pennsylvania, on May 2, 2010. (R. at 425). She was advised to find a mental health care provider there. (R. at 425).

On June 3, 2010, Plaintiff appeared in the emergency department of Conemaugh Valley Memorial Hospital ("Conemaugh") in Johnstown for complaints of suicidal thoughts. (R. at 475 – 77). Plaintiff was admitted to the hospital. (R. at 475). She was alert, cooperative, and in mild

distress. (R. at 475). Her mood was depressed, her affect was blunted, her speech and behavior were appropriate, she had no hallucinations, and her insight and judgment were poor. (R. at 476). Plaintiff had not been compliant with her psychiatric medication regimen for two to three months. (R. at 477, 481). She had been residing at the Hiram G. Andrews Center for purposes of vocational rehabilitation. (R. at 477). She was assigned a GAF score of 30[5]. (R. at 476).

Plaintiff was discharged from Conemaugh on June 9, 2010. (R. at 481 – 82). Plaintiff had been re-started on Prozac and Abilify. (R. at 481). The cessation of her medications, a break-up with her then boyfriend, and the stress of her vocational program had been precipitating factors for her suicidal thoughts. (R. at 481 – 82). Plaintiff showed improvement during her hospitalization and denied suicidal thoughts, but her mood and affect were still flat and restricted. (R. at 482). She was to follow up with outpatient treatment through the Hiram G. Andrews Center. (R. at 482). She was diagnosed with severe, recurrent major depression, and was assigned a GAF score of 50. (R. at 482).

Plaintiff again appeared at the emergency department of Conemaugh on September 21, 2010. (R. at 491 – 95). She appeared depressed, and cut her wrist after being teased by children at the Hiram G. Andrews Center. (R. at 491, 493 – 94). Plaintiff regretted her decision, but was angry at the time. (R. at 491, 493 – 94). The cut was superficial. (R. at 491). Plaintiff was nonetheless admitted to the hospital. (R. at 491, 495). Plaintiff was alert and oriented, and in no acute distress. (R. at 491). Plaintiff's mood and affect were flat and constricted, and her insight and judgment were poor. (R. at 494). She denied hallucinations. (R. at 494). The admitting

---

[5]     An individual with a GAF score of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

physician's diagnostic impressions were depression, stress reaction, and suicidal ideation. (R. at 492). Her GAF score was 25. (R. at 494).

Plaintiff was discharged on September 26, 2010. (R. at 496 – 97). She had participated in individual, group, and recreational therapy. (R. at 496). Upon implementation and adjustment of psychiatric medications, Plaintiff stabilized. (R. at 496). She denied hallucinations or suicidal thoughts. (R. at 496). Plaintiff's mood was pleasant, her affect was full, her speech was fluent and goal directed, and her insight and judgment were improved. (R. at 496). Her discharge diagnosis was severe, recurrent major depressive disorder, without psychotic features. (R. at 496). Her GAF score was 65[6]. (R. at 496). She was to follow up with outpatient treatment. (R. at 497). Her prognosis was fair, if she was compliant with treatment. (R. at 497).

On November 18, 2010, Plaintiff returned to Stairways. (R. at 435 – 36). Plaintiff complained of depression, mood swings, over-activity, and irritability. (R. at 435). Plaintiff claimed that she had been hospitalized twice for suicidal ideation while in Johnstown. (R. at 435). She was not believed to be a good historian. (R. at 435). She currently denied suicidal ideation. (R. at 435). Plaintiff appeared to be disheveled and unkempt, and had a noticeable body odor. (R. at 436). Her mood was euthymic, her affect was bland and shallow, and her insight and judgment were very limited. (R. at 436). Her GAF score was 45. (R. at 436). Her prescription medications were increased. (R. at 436).

Plaintiff appeared at the Meadville Community Health Center in Meadville on November 19, 2010, December 17, 2010, January 7, 2011, January 26, 2011, and February 4, 2011 for physical complaints. (R. at 438 – 51). She was typically in no acute distress, was alert and

---

[6]     An individual with a GAF score of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

oriented, had normal affect and mood, had intact mental status, had normal insight, judgment, thought, and perception, and made appropriate conversation.  (R. at 438 – 51).  She denied anxiety, nervousness, confusion, and depression.  (R. at 438 – 51).

    5.  <u>Functional Capacity Assessments</u>

On December 8, 2009, Derek V. Roemer, Ph.D. completed a Clinical Psychological Disability Evaluation of Plaintiff on behalf of the Bureau of Disability Determination.  (R. at 366 – 72).  Dr. Roemer reviewed Plaintiff's medical record, and conducted a mental examination. (R. at 366).  Dr. Roemer observed Plaintiff to be late for her appointment, but she was dressed appropriately, and exhibited good grooming and hygiene.  (R. at 367).  She was initially very shy, but slowly began to speak more freely.  (R. at 367).

Plaintiff described experiencing emotional setbacks as a result of the deaths of a number of family members and friends, including her father and grandmother, and as a result of three rapes when she was twelve, fourteen, and seventeen years of age.  (R. at 367).  She claimed to sleep all day, over-eat, feel persistent sadness, and suffer nightmares.  (R. at 367).  Plaintiff required special educational support in school, and had low IQ scores.  (R. at 367).  Testing revealed that Plaintiff had a good prognosis for obtaining competitive employment with supportive job placement.  (R. at 367).  For her psychological issues, Plaintiff was taking Prozac and Abilify.  (R. at 367).

Dr. Roemer observed that Plaintiff had logical, connected, and relevant speech, her remote and recent memory seemed adequate, she was alert and oriented, her social judgment was appropriate, and she demonstrated insight.  (R. at 368).  She appeared to require some assistance with reading and writing.  (R. at 368).  Plaintiff also seemed reliant upon others, particularly her boyfriend.  (R. at 368).  She did explain that she enjoyed painting, drawing, writing songs and

poetry, and playing the guitar. (R. at 368). She did all the cooking for her and her boyfriend. (R. at 368).

Dr. Roemer diagnosed Plaintiff with recurrent, severe depression, without psychotic features, post-traumatic stress disorder ("PTSD"), and borderline intellectual functioning. (R. at 369). Her GAF score was 60[7]. (R. at 369). While her depression was significant, Dr. Roemer opined that it could be treated with adequate medication and therapy. (R. at 369). With proper training, Plaintiff was likely to be employable. (R. at 369). She was capable of independently performing activities of daily living, she had no apparent difficulties with social functioning, and her concentration, persistence, and pace were improving with treatment and vocational education. (R. at 369). Dr. Roemer further indicated that Plaintiff had marked functional limitation with respect to understanding, remembering, and carrying out detailed instructions, and moderate limitation understanding, remembering, and carrying out short, simple instructions, making judgments on simple work-related decisions, and responding appropriately to work pressures in a usual work setting. (R. at 370). Plaintiff could manage benefits in her own best interests. (R. at 372).

A Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff was completed on December 28, 2009 by state agency evaluator Phyllis Brentzel, Psy.D. (R. at 377 – 80). Following a review of the medical record, Dr. Brentzel concluded that evidence supported finding impairment in the way of affective disorders, mental retardation, and anxiety-related disorders. (R. at 377). Plaintiff was determined to likely experience marked limitation with respect to understanding, remembering, and carrying out detailed instructions. (R. at 377 – 78). She was otherwise moderately limited in most areas of functioning. (R. at 377 – 78).

---

[7]    An individual with a GAF score of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

Nonetheless, Dr. Brentzel opined that Plaintiff could perform work involving simple one and two-step instructions, and simple, routine, repetitive tasks in a stable work environment, was capable of maintaining regular attendance, punctuality, and socially appropriate behavior, and could perform production-oriented jobs requiring little independent decision-making. (R. at 379). While Dr. Brentzel ultimately believed that Plaintiff was capable of engaging in full-time work, she also stated that Plaintiff was more limited that indicated by Dr. Roemer. (R. at 379 – 80).

On February 4, 2010, a Medical Review Team Disability Certification was completed by Megan Purcell, L.P.C., Ronald Refice, Ph.D., and Annette Jadus, M.A. (R. at 470). It was indicated therein that Plaintiff was incapable of working full-time due to severe, recurrent major depressive disorder, PTSD, and borderline intellectual functioning. (R. at 470). As a result, Plaintiff experienced sadness, emotional lability, poor short-term memory, anxiety, low energy, sleep disturbance, appetite disturbance, poor concentration, autonomic hyperactivity, loss of motivation, feelings of guilt, and indecisiveness. (R. at 470). It was further indicated that Plaintiff met listing level requirements for social security disability eligibility. (R. at 470).

These findings were supplemented by a Vocational Report completed by Ms. Jadus on February 11, 2010. (R. at 464 – 67). Ms. Jadus indicated that – based upon a review of Plaintiff's medical history – her "psychiatric symptomology and cognitive limitations negate the assimilation and retention of basic work skills required at any level of employment within the national economy." (R. at 465). Among the functional limitations Plaintiff would suffer, Ms. Jadus included an inability to complete a normal work day or work week, a high rate of absenteeism, poor concentration and memory, poor comprehension, inability to maintain pace or complete tasks, poor ability to interact with supervisors, co-workers, or the general public, and

poor ability to cope with job stress or criticism. (R. at 466 – 67). Ms. Jadus believed that the record demonstrated marked limitation in activities of daily living, social functioning, and concentration, persistence, and pace. (R. at 467). Plaintiff was found unable to work. (R. at 467).

On April 5, 2010, a Psychological Evaluation of Plaintiff was completed by Martin Meyer, Ph.D. and Julie Uran, Ph.D. (R. at 454 – 62). Plaintiff described suffering with mood swings which caused her to "flip out easily." (R. at 456). She claimed to have violent, aggressive anger episodes, during which she allegedly threw objects and had violent altercations. (R. at 456). Plaintiff also explained that she experienced extreme manic and depressive episodes, anxiety, auditory hallucinations, and flashbacks related to prior physical and sexual abuse. (R. at 456). She also admitted to three suicide attempts and obsessive thoughts of suicide. (R. at 456).

Plaintiff was observed to be adequately attired with good hygiene. (R. at 456). She made minimal eye contact. (R. at 456). Plaintiff was cooperative and did not exhibit abnormal body movements. (R. at 456). Her speech was slow, her mood was restricted and blocked, her affect was flat, her response times were slow, she was alert and oriented, her social judgment was appropriate, and she was a good narrator of her personal history. (R. at 457). She was believed to have a limited capacity for personal insight. (R. at 457). Plaintiff was noted to have difficulty with impulse control and anger, and had poor immediate memory – although, she was able to recall five digits forward and four digits backward. (R. at 457). Plaintiff displayed limited cognitive ability. (R. at 457). She had an adequate fund of vocabulary, but had difficulty with basic mathematics. (R. at 457). Plaintiff's concentration was considered to be poor. (R. at 458).

Drs. Meyer and Uran concluded that Plaintiff's prognosis was poor. (R. at 458). She was considered to likely experience difficulty managing funds in her own best interest. (R. at 458). She had a verbal IQ of 70, a performance IQ of 77, and a full scale IQ of 71. (R. at 458). Her academic performance was at a fifth grade level. (R. at 458). She would likely have difficulty functioning within a vocational environment due to overwhelming depression, poor interpersonal skills, poor impulse control, anger issues, and difficulty with detailed instructions. (R. at 459). Plaintiff was diagnosed with mixed, severe bipolar I disorder with psychotic features, generalized anxiety disorder, borderline intellectual functioning, and personality disorder, NOS. (R. at 460). Her GAF score was 45. (R. at 460).

6. Administrative Hearing

Plaintiff testified that she was removed from the Hiram G. Andrews Center vocational education program due to cutting herself and two hospitalizations for suicidal ideation. (R. at 68 – 69). Plaintiff explained that while her medication non-compliance precipitated her hospitalizations, it was because she could not remember to take her medications as prescribed. (R. at 69). Plaintiff relied upon her boyfriend to remind her to take her medications and care for her personal hygiene. (R. at 70). Without prompting, she often went days without bathing. (R. at 70). However, when Plaintiff had been living with her parents, she did not experience these issues. (R. at 70).

Plaintiff also relied upon her sister for help with household chores, such as cleaning dishes. (R. at 71). Plaintiff claimed to also require help with grocery shopping, because she had difficulty reading labels. (R. at 71). Plaintiff stated that she did not have a checking account, and had difficulty keeping track of money. (R. at 72). She also had difficulty with basic

mathematics.  (R. at 72).  Without her family and boyfriend, Plaintiff did not believe that she could take her medications or attend appointments.  (R. at 76).

Plaintiff described hearing voices.  (R. at 73).  She said that the voices would tell her to harm herself when she was very depressed.  (R. at 74).  Nevertheless, Plaintiff admitted that the worst she had done was to cut herself.  (R. at 74).  Plaintiff did not believe that her psychiatric medications provided her with significant benefits, and that she struggled with suicidal thoughts on occasion.  (R. at 74).  She also had issues with becoming angry, particularly when in public.  (R. at 75).  Plaintiff testified that she would yell and become violent; although, she also said that she had not yet become violent.  (R. at 75).  Plaintiff also had recurring issues with past traumatic experiences.  (R. at 76).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work history would be eligible for a significant number of jobs in existence in the national economy if limited to work not requiring the use of depth perception or field of vision, or exposure to heights, hazardous equipment, or hazardous situations, and involving only simple, routine, repetitive tasks, minimal contact with the public and co-workers, and no fast-paced or production work, in a stable work environment.  (R. at 79).  The vocational expert replied that such an individual would be capable of engaging in work as a "motel cleaner," with 248,000 positions available in the national economy, as an "office cleaner," with 260,000 positions available, or in "janitorial work," with 250,000 positions available.  (R. at 80).  The vocational expert added that if the hypothetical individual could not maintain regular attendance, she would be excluded from full-time work.  (R. at 80).

**B.** ANALYSIS

1. Standard of Review

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[8], 1383(c)(3)[9]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The

---

[8]     Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[9]     Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

## 2. Discussion

The ALJ determined that Plaintiff suffered severe medically determinable impairment in the way of epilepsy, mood disorder, borderline IQ, PTSD, obesity, blindness in the left eye, and a history of drug and alcohol abuse. (R. at 31). Due to these impairments, the ALJ concluded that Plaintiff would be limited to work not requiring performance of tasks where depth perception or field of vision are necessary, at heights, with hazardous equipment, or in hazardous situations, and involving only simple, routine, repetitive tasks, minimal interaction with co-workers and the public, a stable work environment, and no fast-paced or production work. (R. at 35). Based upon the testimony of the vocational expert, the ALJ found that even with said limitations, Plaintiff would be capable of sustaining a significant number of jobs in the national economy. (R. at 40 – 41). The ALJ, therefore, decided that Plaintiff was not entitled to CIB or SSI. (R. at 41).

Plaintiff objects to the decision of the ALJ, arguing that he erred in failing to acknowledge that Plaintiff could not finish vocational rehabilitation due to psychiatric issues, in failing to discuss her need for vocational training for competitive employment, in relying more upon the opinion of the state agency evaluator than examining medical professionals, and in failing to discuss the import of consistently low GAF scores. (ECF No. 10 at 10 – 14).

Defendant counters that the ALJ adequately supported his decision with substantial evidence from the record, and should be affirmed. (ECF No. 12 at 15 – 22). The Court agrees with Plaintiff.

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the ALJ failed to meet these standards.

The ALJ failed to discuss – in any appreciable manner – the multiple notations within Plaintiff's medical sources' notes that Plaintiff would require vocational rehabilitation and supportive job placement in order to engage in competitive employment. He also failed to note that Plaintiff was unable to complete her vocational rehabilitation program due to psychological issues and hospitalization. These facts, alone, are not necessarily dispositive, and an ALJ is not bound to accept a medical source's conclusions. *Brown v. Astrue*, 649 F. 3d 193, 196 (3d Cir. 2011) (citing *Kertesz v. Crescent Hills Coal Co.*, 788 F. 2d 158, 163 (3d Cir. 1986)). Regardless, these findings may indicate that Plaintiff suffered a greater degree of functional limitation than found by the ALJ. The ALJ's failure to analyze this in his discussion deprives the Court of a basis for determining what import the inability to complete needed vocational training may have had on the ALJ's disability decision. An ALJ's findings should be as "comprehensive and

analytical as feasible," so that the reviewing court may properly exercise its duties under 42 U.S.C. § 405(g). *Cotter*, 642 F. 2d at 705. While an ALJ does not have a duty to review every piece of evidence in a voluminous record, the record at present was hardly voluminous, and the failure of the ALJ to discuss relevant findings regarding Plaintiff's ability to work leaves the Court "to wonder whether he considered and rejected them, considered and discounted them, or failed to consider them at all." *Fargnoli v. Massanari*, 247 F. 3d 34, 44 (3d Cir. 2001). This is clear error necessitating remand. *Id.* The ALJ's decision should allow a court the ability to determine if "significant probative evidence was not credited or simply ignored." *Id.* at 42.

Next, while it was indicated in the record that medication non-compliance was responsible, at least in part, for instances of psychological decline, the ALJ failed to explain the import of numerous notations of difficulty with short-term memory in conjunction with Plaintiff's testimony that she had difficulty remembering to take her psychiatric medications; medications which the ALJ explicitly acknowledged were necessary to her emotional stability. Findings of difficulty with short-term memory are clearly relevant to a determination as to the materiality of Plaintiff's treatment non-compliance to her inability to work, and her capability to maintain a treatment regimen in order to remain mentally stable enough to work. The ALJ's failure to discuss Plaintiff's issues with memory was error. As in the present case, if the ALJ has not adequately explained his or her treatment of obviously probative evidence, the court cannot say whether substantial evidence supports an ALJ's conclusion. *Cotter*, 642 F. 2d at 705 (citing *Dobrowolsky v. Califano*, 606 F. 2d 403, 407 (3d Cir. 1979) ("the special nature of proceedings for disability benefits dictates extra care on the part of the agency in . . . explicitly weighing all evidence.")). Remand is required.

Lastly, the ALJ also failed to discuss a number of evaluations found within the medical record.  An ALJ is entitled to rely upon the findings of the state agency evaluator.  *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (3d Cir. 2012).  Here, however, the Court cannot say that this reliance was proper in light of the ALJ's decision to discount the weight of several evaluations, and accompanying GAF scores, in an inappropriately cursory fashion by merely indicating that these were not fully consistent with the objective medical evidence on record.  (R. at 39 – 40).  More specificity is required, according to the precedent of this circuit.  An ALJ must do more than "simply state ultimate factual conclusions.  *Stewart v. Sec'y of Health, Educ., and Welfare*, 714 F. 2d 287, 290 (3d Cir. 1983) (citing *Hargenrader v. Califano*, 575 F. 2d 434 (3d Cir. 1978)).  "The ALJ must include subsidiary findings to support the ultimate findings."  *Id.* The evidentiary basis for an ALJ's decision must be "clearly disclosed and *adequately sustained*."  *Cotter*, 642 F. 2d at 705 n. 7 (citing *Chenery Corp.*, 318 U.S. at 94)) (emphasis added).  The ALJ must provide a more thorough discussion of the Exhibits accorded only "moderate" and "minimal" weight in his decision.  (R. at 39 – 40).  "Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions."  *Fargnoli*, 247 F. 3d at 42.  Remand is justified, here.

Presently, the ALJ's review of Plaintiff's medical history omitted a significant quantity of probative evidence from analysis.  To find that this ALJ's decision is supported by substantial evidence would approach "an abdication of the court's 'duty to scrutinize the record as a whole to determination whether the conclusions reached are rational.'"  *Stewart*, 714 F. 2d at 290 (quoting *Gober v. Matthews*, 574 F. 2d 772, 776 (3d Cir. 1978)).  Remand for proper analysis is warranted.

## C.    CONCLUSION

Based upon the foregoing, the ALJ failed to support his decision with substantial evidence.  Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be granted, to the extent remand for further consideration is demanded, and denied, to the extent reversal and an immediate award of benefits is demanded, Defendant's Motion for Summary Judgment be denied, and the decision of the ALJ be vacated and the case remanded for reconsideration consistent with this Opinion.

"On remand, the ALJ shall fully develop the record and explain [his or her] findings… to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ.  *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 – 01 (3d Cir. 2010).  *See also Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 432 (W.D. Pa. 2010).  Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ.  *Id.* at 801 n. 2.

In accordance with the Magistrate Judges Act, 28 U.S.C.  636(b)(1)(B) and (C), and Rule 72.D.2  of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections.  Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto.  Failure to file timely objections will constitute a waiver of any appellate rights.


September 18, 2013

*s/ Susan Paradise Baxter*
Susan Paradise Baxter
United States Magistrate Judge

cc/ecf: All counsel of record.